UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LETONIO C. SWADER | ) | |
| | ) | |
| Petitioner, | ) | Case No. 3:10-cv-00465 |
| | ) | |
| v. | ) | |
| | ) | Judge Eli Richardson |
| SHAWN PHILLIPS, WARDEN | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court[1] is a report and recommendation of the Magistrate Judge (Doc. No. 147, "R&R"), wherein the Magistrate Judge recommends that the Court deny the "Second Amended Petition for Writ of Habeas Corpus" (Doc. No. 51, "Amended Petition") filed by Petitioner, Letonio C. Swader. Petitioner filed objections to the R&R (Doc. No. 155, "Objections"),[2] to which Respondent filed a response (Doc. No. 159, "Response to Objections"). Unsurprisingly, Respondent did not file any objections to the R&R.

Also pending before the Court is Petitioner's "Motion to Substitute" (Doc. No. 160), wherein Petitioner requests "an order substituting Shawn Phillips, Warden, for Guy Bosch as Respondent." (*Id.* at 1). In that motion, Petitioner asserts that "[i]n this habeas corpus proceeding, the proper Respondent is the current Warden of the prison where the State confines [Petitioner], which is the Morgan County Correctional Complex [MCCX] in Wartburg, Tennessee." (*Id.*).

---

[1] Herein, "the Court" refers to the undersigned District Judge, as opposed to the Magistrate Judge who authored the R&R.

[2] Herein, a given use of the term "Objections" may refer to the document (Doc. No. 155) itself, to the purported objections contained therein (i.e., the "objections" to the R&R contained within the "Objections"), or both.

Petitioner further asserts essentially that Guy Bosch has been replaced as the Warden of MCCX and that Shawn Phillips is the current Warden of MCCX. (*Id.*). This motion is unopposed and is well taken, and therefore it (Doc. No. 160) is **GRANTED.**

For the reasons stated herein, the Court will adopt the R&R and deny the Amended Petition.

<u>LEGAL STANDARD FOR REVIEW OF A REPORT AND RECOMMENDATION</u>

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which a *proper* objection is made. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).[3] The district judge may accept, reject, or modify

---

[3] Significantly, and perhaps surprisingly, the statute does not actually direct the district judge to expressly rule on the objections themselves (i.e., expressly sustain or reject the objector's *specific* criticism(s) of what the magistrate judge did). Instead of requiring the district judge to determine *the* validity of the objections to what the magistrate judge did, the statute requires the district judge to make a determination—*de novo*, which inherently means ultimately without reference to whether what the magistrate judge did was objectionable—of the portion(s) of the report and recommendation to which objection was made. Moreover, since the review of the objected-to portions of the report and recommendation is *de novo*, any critiquing of what the magistrate judge did ultimately would be dicta (albeit relevant and probative dicta to the extent that such critiquing explains the analysis underlying the district judge's determination of the objected-to portions of the R&R). Additionally, district judges in this Circuit not infrequently either decline to rule on (or, to the same effect, deny as moot) particular objections on the specific ground that so doing is unnecessary to rule on the objected-to portion of the report and recommendation. *E.g., Collins v. Bright*, No. 2:13-CV-02987-JPM-CGC, 2021 WL 5205622, at *3 (W.D. Tenn. Nov. 9, 2021) ("[T]his objection does not affect or alter the conclusions of the Magistrate Judge and is overruled as moot."); *Lashuay v. Fornwalt*, No. 1:15-CV-1109, 2017 WL 4160947, at *1 (W.D. Mich. Sept. 20, 2017) ("This Court need not resolve all of the objections," because only some of them needed to be addressed in order to resolve the motion that was the subject of the report and recommendation); *Weatherspoon v. Williams*, No. 2:14-CV-108, 2016 WL 6070994, at *1 (W.D. Mich. Oct. 17, 2016) ("Plaintiff's objections are irrelevant and will be denied."); *Bowers v. Burnett*, No. 1:08-CV-469, 2011 WL 1047343, at *2 n.1 (W.D. Mich. Mar. 18, 2011) (noting that the Court need not resolve an objection to the extent that the objector's position on the R&R has other fatal deficiencies); *Powell v. Alcoa High Sch.*, No. 3:10-CV-212, 2010 WL 2598260, at *2 (E.D. Tenn. June 24, 2010) ("[B]ecause this objection is irrelevant to [the magistrate judge's] recommendations, it is hereby overruled."); *Cline v. Kelly*, No. 09CV859, 2010 WL 1006529, at *1 n.1 (N.D. Ohio Mar. 16, 2010) ("The Court acknowledges [the petitioner's] objection, but need not resolve it because that specific fact is not relevant to the resolution of any of the grounds for relief set forth in [the petitioner's] Petition" that the magistrate judge had recommended be denied).

Thus, although it seems clear that the district judge *can* expressly rule on the objections, the Court concludes that a district judge is not required to do so. And herein, the Court declines to do so, focusing instead on the required *de novo* review and determination of the objected-to parts of the R&R—albeit in

the recommended disposition, review further evidence, or return the matter to the magistrate judge with instructions. *Id.*

Only "specific written objections" to the magistrate judge's proposed factual findings and legal conclusions are "proper" under Federal Rule of Civil Procedure 72(b). *Frias v. Frias*, No. 2:18-cv-00076, 2019 WL 549506, at *2 (M.D. Tenn. Feb. 12, 2019). Likewise, the applicable statute contemplates *de novo* determination only "of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). Furthermore, Local Rule 72.02(a) provides that such objections must be written and must state with particularity the specific portions of the Magistrate Judge's report or proposed findings or recommendations to which an objection is made. *See* Fed. R. Civ. P. 72(b)(2); L.R. 72.02(a). The upshot is that the Court: (i) must review, *de novo*, the specific portions of the Magistrate Judge's report or proposed findings or recommendations to which written objection is made; and (ii) need not review any other portion of the report and recommendation.

PROCEDURAL BACKGROUND

Neither Petitioner nor Respondent dispute the cogent recitation of the procedural background of this matter—including descriptions of the evidence introduced at trial and at the hearing on Petitioner's petition for post-conviction relief—set forth in the R&R.[4] Based on the absence of a challenge to this recitation and the Court's independent review of it, the Court adopts it and sets forth that recitation immediately below.

The R&R initially noted:

> In 2004, a jury convicted Petitioner . . . of first-degree felony murder, second-degree murder, attempted especially aggravated robbery, and possession of

---

part by taking account of any ways in which the objections (and response thereto) shed light on what the Court's ultimate determination should be.

[4] All of the applicable procedural history was from proceedings in various Tennessee state courts.

a deadly weapon during the commission of an offense. *State v. Swader*, No. M2005-00185-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 109, at *1 (Crim. App. Feb. 6, 2006); Docket No. 1, p. 1.

Petitioner's murder convictions were merged, and he was sentenced to life. *Id.* The Petitioner was also sentenced to 10 years for the attempted especially aggravated robbery conviction and two years for the possession of a weapon convictions. *Id.* On February 6, 2006, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction. *Id.* Thereafter, the Petitioner filed for post-conviction relief raising claims of insufficient evidence to support his conviction, ineffective assistance of counsel, and double jeopardy. *Swader v. State*, No. M2008 01021-CCA-R3-PC, 2009 Tenn. Crim. App. LEXIS 854 (Crim. App. Oct. 7, 2009). The state court rejected Petitioner's arguments. *Id.* at *11. Subsequently, the Tennessee Supreme Court declined Petitioner's permission to appeal on three occasions. *State v. Swader*, No. M2005-00185-SC-R11 CD, 2006 Tenn. LEXIS 576 (June 26, 2006); *Swader v. State*, No. M2008-01021-SC-R11-PC, 2010 Tenn. LEXIS 245 (Mar. 15, 2010); *Swader v. State*, No. M2013-01585-SC-R11-PC, 2014 Tenn. LEXIS 170 (Feb. 24, 2014).

Having exhausted his attempts to seek relief in state courts, Petitioner now brings this action to seek habeas corpus relief action under 28 U.S.C. § 2254. Docket No. 51, p. 2; Docket No. 51, p. 12. Petitioner requests that this Court find: (1) ineffective assistance of counsel; (2) the State's withholding of material evidence constituted a violation of *Brady v. Maryland* [373 U.S. 83 (963)]; (3) the State knowingly proffered false testimony; (4) the Petitioner's confession was involuntary and should have been suppressed; and (5) that the Petitioner's sentence of life imprisonment constituted cruel and unusual punishment. Docket No. 51, p. 6-11.

(R&R at 1-2). The R&R then set forth the evidence adduced at Petitioner's trial and hearing on post-conviction review in state court (primarily by quoting the Tennessee Court of Criminal Appeals):

In deciding Petitioner's direct appeal from his conviction, the Tennessee Court of Criminal Appeals summarized the factual background of this case:

On February 2, 2003, the victim, Kristen Holzapfel, was shot in the back while standing outside an apartment complex in Murfreesboro. A petition was filed in the Rutherford County Juvenile Court, charging the appellant with first degree felony murder, attempted especially aggravated robbery, and possession of a firearm during the commission of an offense. The appellant was transferred to criminal court to be tried as an adult. The Rutherford County Grand Jury then charged the appellant with first degree

premeditated murder, first degree felony murder, attempted especially aggravated robbery, and possession of a firearm during the commission of an offense.

Wayne Lawson, the victim's boyfriend, testified at trial that he was a detective with the Murfreesboro Police Department and was divorced with two young children. In February 2003, Lawson lived in the Gateway apartment complex, apartment number A-9. He stated that on Sunday, February 2, 2003, he and the victim spent the day with his children. That evening, the victim and Lawson's daughter made jewelry from a craft kit, and Lawson prepared dinner. They finished eating about 5:30 p.m., and Lawson began bathing his children while the victim cleaned up in the living room. At some point, the victim went into the bathroom and asked Lawson for his car keys so that she could get a vacuum cleaner out of his car. Lawson gave the victim the keys, and the victim went outside. Lawson testified that after he finished bathing his children, his daughter told him that she could not find the victim and that a police officer was outside. Lawson looked out a window and saw the officer standing over the victim, who was lying on the ground next to Lawson's car. Lawson went outside, and Officer April Samol told Lawson that she believed the victim had been shot. Lawson saw a small hole in the victim's back and a large amount of blood around her head. Lawson turned the victim over and saw that her eyes were open and that her pupils were fixed. The victim was unresponsive, had no pulse, and was not breathing. Lawson stated that he never heard a gunshot.

Isaac Putnam testified that in February 2003, he lived in the Gateway apartment complex, apartment number A-13. On the evening of February 2, he and his wife heard a gunshot. Putnam walked onto his patio and saw the victim lying on the sidewalk. He also saw blood underneath the victim's body and ran back inside to telephone 911. By the time he got off the telephone, Officer Samol had arrived. On cross-examination, Putnam stated that after he heard the gunshot and went outside, he did not see anyone other than the victim.

Officer April Samol of the Murfreesboro Police Department testified that on February 2, 2003, she was dispatched to the Gateway apartment complex in response to a possible shooting. When she arrived, Isaac Putnam flagged her down and told her that a woman was lying in the parking lot. Officer Samol saw the victim lying face-down in a fetal position. Wayne Lawson came out of his apartment and asked what was going on, and Officer Samol got out of her patrol car and told him that she thought the victim had been

shot. Lawson began screaming and crying. The victim did not have a pulse and was not breathing. Lawson lifted the victim's shirt, and Officer Samol saw a gunshot wound in the victim's back. When other officers arrived, they found a nine millimeter shell casing in the parking lot. They also found a set of keys, a vacuum cleaner, and a vacuum cleaner bag.

Jennifer Lynn Blackwell testified that on February 2, 2003, she lived in the G building of the Gateway apartment complex. That evening, Blackwell was talking on her cellular telephone when an African-American male in his teens or early twenties walked up to her glass door. He asked Blackwell for a cigarette, and she gave him one. The male was standing about one and one-half feet away from Blackwell, and she saw him for about thirty seconds. She stated that she was ninety to ninety-five percent certain that the male was the appellant.

Special Agent Jason Wilkerson of the Tennessee Bureau of Investigation (TBI) testified that he investigated the case. A nine-millimeter shell casing was recovered from the crime scene and was found about twenty feet from the sidewalk. Agent Wilkerson also attended the victim's autopsy and received vials of the victim's blood and urine and her clothes. At some point, the appellant became a suspect. On the night of February 7, 2003, Agent Wilkerson and Detective Major Jim Gage were sitting in Gage's unmarked police vehicle and were conducting surveillance on the appellant's home. The appellant came out of his house, walked over to the vehicle, and began talking with the officers. The appellant told the officers his name, and the officers told the appellant that they needed to speak with him about a crime that had taken place. The appellant got in the front passenger seat of the vehicle, Agent Wilkerson got in the back seat, and Detective Gage drove them to the police department. Agent Wilkerson testified that the appellant was not under arrest at that time.

Agent Wilkerson testified that when they arrived at the police department, he read the appellant Miranda warnings and had the appellant sign a waiver of rights form. The appellant gave a statement, and Agent Wilkerson wrote out the statement. After the interview, the appellant read, made corrections to, and signed the written statement, which was read to the jury. According to the written statement, the appellant borrowed a nine-millimeter gun from Eric Sargent. On the day of the shooting, he was at an apartment complex in Murfreesboro and was near the G building. He walked toward the A building and saw a woman outside. The appellant walked up to the woman and pointed the gun at her. The

woman, who was near the sidewalk, turned to run, and the appellant, who was standing in the parking lot, turned away from her. As the appellant turned, the gun "went off." The appellant did not know if the woman had been shot and ran away. According to the written statement, the appellant pointed the gun at the woman in order to get money from her and had "thought about robbing someone before [he] went over there and did it."

Agent Wilkerson testified that during the interview, he asked the appellant how the appellant got to the apartment complex and the appellant would not tell him. He stated that the appellant also would not say where the appellant went after the shooting. The appellant told Agent Wilkerson that after the shooting, he gave the gun back to its owner but would not tell him who owned the gun. Agent Wilkerson later learned that the gun belonged to Jimmy Douglas' uncle. Agent Wilkerson said that the appellant told him the appellant was about seven feet away from the victim at the time of the shooting. Agent Wilkerson testified that the appellant's interview was videotaped, and the tape was played for the jury.

Detective Major James E. Gage of the Murfreesboro Police Department testified that because Wayne Lawson was a detective with the police department, the TBI handled the investigation. From Jennifer Blackwell's description, the police developed a composite sketch of a suspect. Blackwell had described the suspect as an African-American male; about five feet, nine inches tall; in his early twenties; and wearing a bulky, quilted jacket. Detective Gage stated that when he and Agent Wilkerson drove the appellant to the police department, the appellant was wearing a heavy, down-filled jacket. At the police department, the appellant told Detective Gage that he had talked with a woman at the apartment complex before the shooting. Detective Gage testified that according to Jennifer Blackwell, the male she saw on the night of the shooting had asked her for a cigarette between 6:00 and 6:05 p.m. Detective Gage stated that the 911 call reporting the shooting was received at the police department between 6:12 and 6:16 p.m.

Dr. Amy R. McMaster testified that she performed the victim's autopsy. The victim had a gunshot wound to the middle of her upper back and died from the gunshot. The bullet traveled straight, and Dr. McMaster concluded that the gun was not fired at an angle. The bullet severed the victim's spinal cord, and the victim would have been paralyzed and unable to walk. The bullet also severed the victim's aorta, and the victim would have bled to death quickly. After receiving the gunshot, the victim could have lived for a few minutes, but she would have been unable to speak. Dr.

McMaster found no soot on the victim's skin or clothing, indicating that the wound was a "distant gunshot wound." On cross-examination, Dr. McMaster testified that if the gun had been seven feet away from the victim when fired, the resulting wound would have been classified as a distant gunshot wound.

Special Agent Don Carman of the TBI testified that he was a forensic scientist in the firearms identification unit. He received a nine millimeter pistol from Agent Wilkerson, a shell casing recovered from the crime scene, and a bullet recovered from the victim's body. Agent Carman test-fired bullets from the pistol and compared them to the bullet recovered from the victim. He concluded that the bullet recovered from the victim was fired from the gun. He also examined the spent shell casing recovered from the crime scene and concluded that it had been fired from the gun. Agent Carman stated that in order for the gun to have been fired, seven and three-quarter pounds of pressure had to be applied to the trigger. He examined the victim's clothing and found no gunpowder residue. On cross examination, Agent Carman testified that if the gun had been fired from more than three or four feet away, the gun would not have left gunpowder residue on the victim.

The appellant, who was seventeen years old at the time of trial, testified that he had been sixteen at the time of the shooting and a full-time high school student. On the afternoon of February 2, 2003, he was at his cousin Robert Gooch's house and stayed there for two to five hours. At some point, the appellant telephoned Shurrell Hyde, a former girlfriend. He went to Hyde's house about 5:30 p.m. and stayed there for about thirty minutes. The appellant then went outside, smoked a marijuana cigarette, and started walking. He said that he walked to the Gateway apartment complex, saw a woman outside, and asked her for a cigarette. The woman gave him the cigarette, and the appellant continued walking. The appellant saw the victim and walked past her. He turned around, and the two of them looked at each other briefly. The appellant said that the victim turned to run, that he turned to run, that the gun fired, and that "everything went black."

The appellant testified that he ran back to Robert Gooch's house and that Gooch drove him home. He left the gun at Gooch's house and learned the next morning that the victim had been killed. A few days after the shooting, the appellant noticed Agent Wilkerson and Detective Gage outside, near a church. He walked up to them and told them his name. The officers drove the appellant to the police department, and the appellant told them about the shooting. He stated that he did not remember telling Agent Wilkerson that he

had gone to the apartment complex intending to rob someone and that he did not go to the Gateway apartment complex intending to commit a robbery. He acknowledged signing the written statement but said that he did so because he wanted to see his mother and "get it over with." When asked if he could give a reason for his pointing the gun at the victim, the appellant stated that he could not.

On cross-examination, the appellant testified that he could read and write. He stated that he borrowed the gun from Eric Sargent, a schoolmate, on the Tuesday or Wednesday before the shooting and that he was carrying the gun for protection. The appellant said that he carried the gun in his waistband or his pocket and that he showed the weapon to several friends. He said that Sargent told him the gun was loaded but that he never checked the gun. On the evening of February 2, the appellant visited Shurrell Hyde, went outside and smoked marijuana, and started walking. He walked to the Gateway apartment complex, looking for someone who could give him a cigarette. He saw Jennifer Blackwell talking on her cellular telephone, and she gave him one. After receiving the cigarette, he continued walking but did not know where he was going. The appellant saw the victim and walked past her. He turned around and made eye contact with the victim. He pulled out his gun, the victim turned to run, the appellant turned to run, and the gun fired.

The appellant acknowledged that before the shooting, the victim had not been a threat to him. He stated that he did not know why he turned around to look at the victim and that he ran away after the shooting because he was scared. He denied "plotting" to rob someone and said that if he had known the victim had been shot, he would have tried to get help for her. The appellant said that he ran back to Robert Gooch's house and left the gun beside a tree but that he was not trying to hide the gun. He said that he learned the next morning that the victim had been killed, that he went to school, and that he was planning to turn himself in to the police. He denied shooting the victim because she could identify him and said that he "truly and deeply" did not know why he shot her.

Although the appellant was charged with first degree premeditated murder, the jury convicted him of the lesser included offense of second degree murder, a Class A felony. The jury also convicted him of first degree felony murder; attempted especially aggravated robbery, a Class B felony; and possession of a deadly weapon during the commission of an offense, a Class E felony. The trial court merged the murder convictions and sentenced the appellant to life. The trial court also sentenced the appellant as a

Range I, standard offender to ten years for the attempted especially aggravated robbery conviction and two years for the possession of a weapon conviction. The trial court ordered the appellant to serve the life and ten-year sentences concurrently and ordered that the two-year sentence be served consecutively to the other two.

*Swader*, 2006 Tenn. Crim. App. LEXIS 109, at *2.

Thereafter, in considering Petitioner's post-conviction petition, trial counsel testified at the post-conviction hearing as follows:

At the post-conviction hearing, the petitioner's trial counsel testified that he had eighteen years of experience. He testified that he did not represent the petitioner in juvenile court. He said that he was appointed to represent the petitioner and that he visited him in jail at least two times. Counsel reviewed discovery with the petitioner and met with him on other occasions surrounding court appearances. Counsel did not file any written motions in this matter. He testified that this was a strategic decision because the district attorney general agreed not to file a notice of enhancement if counsel would not seek a continuance to file written motions. On cross-examination, he explained that the State had provided him with witness statements and the tapes it intended to introduce. The State agreed to redact portions of the tapes that counsel thought were objectionable and agreed to allow him to make a motion to suppress the petitioner's statement orally.

Counsel said that he did not ask for a new mental evaluation to be done by the trial court because the petitioner had been found competent by the juvenile court. He did not have any reason to believe that the petitioner was incompetent. He said that he did not seek expert testimony because it was their position that the shooting was an accident.

The petitioner testified that the only time trial counsel came to visit him in jail was in the day before trial and that counsel spoke to him for only fifteen to twenty minutes. The petitioner testified that he did not recall authorizing counsel to make a plea agreement. He said that, if he had it to do over again, he would not have agreed to transfer to Circuit court. The petitioner acknowledged that he spoke with counsel at the courthouse for a few minutes at a time prior to court proceedings.

The petitioner testified that he did not feel informed about his case while it was pending. He said that counsel advised him to testify so he could explain what really happened but that counsel

> never told him he could decline to testify. He testified that counsel did not prepare him to testify.
>
> During cross-examination, the petitioner acknowledged that an attorney other than his trial counsel entered the transfer agreement to Circuit court. He said that he only remembered one time that trial counsel visited him in jail. He relied on trial counsel to file any necessary motions and was unaware of any motions that should have been filed. The petitioner agreed that he pulled the trigger that killed the victim but that it was not done intentionally. He also agreed that his testimony was the only way he could show the trial court that he did not intend to shoot or rob the victim.

*Swader*, 2009 Tenn. Crim. App. LEXIS 854, at *3-4.

(R&R at 2-7). Next, the R&R—repeating some of the information set forth above—described in broad strokes the course of this litigation through trial, state post-conviction relief proceedings, and the instant federal habeas action:

> After a jury trial in 2004, Petitioner was convicted of one count each of first-degree felony murder, second-degree murder, attempted especially aggravated robbery, and possession of a deadly weapon during the commission of an offense. Docket No. 1, p. 1. Petitioner's murder convictions were merged, and he was sentenced to life. *Swader*, 2006 Tenn. Crim. App. LEXIS 109, at *1. The Petitioner was also sentenced to 10 years for the attempted especially aggravated robbery conviction and two years for the possession of a weapon convictions. *Id.* Petitioner directly appealed his convictions, raising the following issues: (1) the State committed reversible error by informing potential jurors during *voir dire* that the punishment for first-degree murder in this case was life with the possibility of parole; (2) the trial court erred in failing to suppress his statement to the police; and (3) the evidence was insufficient to support his convictions. *Id.* The Tennessee Court of Criminal Appeals affirmed the judgments of the trial court on February 6, 2006. *Id.* at *32. The Petitioner then applied for leave to appeal to the Tennessee Supreme Court. *Swader*, 2006 Tenn. LEXIS 576. The Tennessee Supreme Court declined permission to appeal on June 26, 2006. *Id.*
>
> Subsequently, Petitioner filed a *pro se* petition for post-conviction relief on May 21, 2004. Docket No. 51, p. 3. After the appointment of counsel, the Petitioner filed an amended petition for post-conviction relief. Docket No. 51, p. 3. On May 12, 2008, the trial court denied the Petitioner post-conviction relief. Docket No. 51, p. 3. On October 7, 2009, the Tennessee Court of Criminal Appeals affirmed the trail court's denial of post-conviction relief, finding a claim of sufficiency of the evidence was not cognizable for post-conviction relief, counsel rendered constitutionally effective assistance, and that the Petitioner waived the issue of

double jeopardy. *Swader*, 2009 Tenn. Crim. App. LEXIS 854, at *11. Petitioner then appealed to the Tennessee Supreme Court, but his appeals were denied on March 15, 2010, and February 24, 2014. *Swader*, 2010 Tenn. LEXIS 245; *Swader*, 2014 Tenn. LEXIS 170.

On May 13, 2013, Petitioner filed his "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody." Docket No. 1, p. 1. Petitioner was appointed counsel and supplemented his pro se petition with an amended petition on November 12, 2010. Docket No. 28, p. 5. Now pending before this Court is Petitioner's second amended petition filed on May 29, 2013. Docket No. 51, p. 1. Petitioner raises the five following claims: (1) he had constitutionally ineffective assistance of counsel; (2) the State's withholding of material evidence constituted a violation of *Brady v. Maryland*; (3) the State knowingly proffered false testimony; (4) the Petitioner's confession was involuntary and should have been suppressed; and (5) that the Petitioner's sentence of life imprisonment constituted cruel and unusual punishment. Docket No. 51, p. 6-11. Respondent filed an answer on July 1, 2013. Docket No. 58, p. 1.

On July 10, 2013, Petitioner moved to stay the instant habeas proceedings to exhaust his state remedies before seeking federal habeas review. Docket No. 64. Specifically, he sought to file a motion in state court to reopen his post-conviction proceedings and present his fifth claim under *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Docket No. 64. The motion was granted, and the instant proceeding was administratively closed. Docket No. 67. After filing his motion in the Circuit Court for Rutherford County, the trial court denied his motion on the grounds that *Miller* was inapplicable to the Petitioner's original sentence of life with the possibility of parole. Docket No. 81-1, p. 32. Petitioner then filed an application for permission to appeal the trial court's denial of his motion but was denied on the same grounds by the Tennessee Court of Criminal Appeals on September 24, 2013. Docket No. 81-3, p. 1. Petitioner filed an application for permission to appeal with the Tennessee Supreme Court which was ultimately denied on February 24, 2014. Docket No. 81-6; Swader, 2014 Tenn. LEXIS 170.

On August 17, 2023, Petitioner filed a supplemental brief in support of the amended petition for a writ of habeas corpus. Docket No. 141. Respondent filed a supplemental brief in opposition on September 18, 2023. Docket No. 142. Petitioner filed a reply in response to the Respondent's supplemental brief on October 5, 2023. Docket No. 145.

(R&R at 8-10).

In order to place in context the R&R's recommendations and reasoning, it is helpful to discuss first various legal principles concerning claims of ineffective assistance of counsel, then

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). The Court begins with the former topic.

LEGAL PRINCIPLES  REGARDING INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court held in *Strickland v. Washington*, 466 U.S. 668 (1984),[5] that "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *see also id.* at 685 ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted).

Under *Strickland*, the deficiency of counsel's performance is "measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 687, 688); *see also Wiggins*, 539 U.S. at 521 ("[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (quoting *Strickland*, 466 U.S. at 688)). "[I]n applying *Strickland* . . . , hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . decisions are made and by giving a 'heavy measure of deference to counsel's judgments[.]'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691).

---

[5] Notably, *Strickland* happened to be a capital case, although it is apparent that its teachings apply likewise to non-capital cases.

*Strickland* made clear, among other things, that counsel has a duty to investigate matters relevant to a case as appropriate. *See* 466 U.S. at 690-91. *Strickland* then noted that counsel's strategic choices are "virtually unchallengeable" when they are "made after thorough investigation of law and facts relevant to plausible options." *Id*.

LEGAL STANDARDS, INCLUDING EXHAUSTION AND
PROCEDURAL DEFAULT, GOVERNING HABEAS RELIEF UNDER THE AEDPA

Petitioner's right to relief under the Amended Petition is subject to 28 U.S.C. § 2254(d), as amended by AEDPA. As amended, that subsection provides:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). As the undersigned noted last year, quoting with approval a report and recommendation in a habeas action under 28 U.S.C. § 2254:

> The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).
>
> Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). To be actionable

under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court[] proceeding." 28 U.S.C. § 2254(d)(2). The statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA "standard is difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102; see also *Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); *see also Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "'[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State'" with respect to each claim, or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established

appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting *id.* at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39 (exhaustion of remedies)).

> "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Under the doctrine of procedural default, a petitioner who may no longer present claims in state court because he or she failed to meet state procedural requirements must "demonstrate cause for his [or her] state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The one exception to this doctrine "is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that [the federal habeas court's] failure to review his [or her] federal claim will result in a fundamental miscarriage of justice." *Id.*

*Davidson v. Genovese*, No. 3:16-CV-01334, 2025 WL 3188753, at *3-4 (M.D. Tenn. Nov. 14, 2025). Regarding the procedural default doctrine in particular, it can alternatively be described (at least in part) as follows: "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citations omitted).

And regarding the interplay between the doctrine of procedural default and the requirement of exhaustion, it is worth noting that a claim also may be "technically exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483-84 (6th Cir. 2012)). The point here is that such a claim is treated as exhausted *even though it was never presented to the state courts* and, in the federal habeas action, is susceptible to a challenge based not on failure to exhaust but rather on procedural default.[6]

---

[6] The Supreme Court has discussed the points of similarity between these two concepts as follows:

In *Martinez v. Ryan,* 566 U.S. 1, 17 (2012), the Supreme Court held that ineffective assistance of post-conviction counsel may, in some circumstances, establish cause to overcome the procedural default of a substantial claim of ineffective assistance of trial counsel (at times herein, "IATC"). 566 U.S. at 17. In particular, it can establish cause "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Id.* "The following year, the Supreme Court held that *Martinez* applies not only in states that prohibit petitioners from raising ineffective-assistance claims on direct appeal, but also to those whose legal systems 'make it virtually impossible' to do so." *See Zagorski v. Mays*, No. 3:99-cv-01193, 2018 WL 4352705, at \*3 (M.D. Tenn. Sept. 12, 2018) (citing *Trevino v. Thaler*, 569 U.S. 413, 417 (2013)). And "the Sixth Circuit has held that this *Martinez/Trevino* exception applies in Tennessee." *Id.* (citing *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014)). So, ineffective assistance of post-conviction counsel can constitute cause for purposes of excusing a procedural default. However, precedent in this circuit is clear that *Martinez* does not apply to excuse (based on post-conviction counsel's ineffectiveness) the procedural default of claims other than claims of *ineffective assistance of counsel at trial. See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). As to claims that *are* within the scope of *Martinez*—i.e., assertions that post-conviction counsel's ineffectiveness constitutes cause for purposes of excusing a procedural default of a claim of IATC, the Sixth Circuit has noted:

> [The doctrine of procedural default] is an important corollary to the exhaustion requirement. Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims in the first instance. The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine.

*Davila*, 582 U.S. 521, 527-28 (citations and internal quotation marks omitted).

> As to these claims, the district court should determine . . .: (1) whether state post conviction counsel was ineffective; and (2) whether [the petitioner's underlying] claims of ineffective assistance of [trial] counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [the petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [the petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits.

*Atkins*, 792 F.3d at 660 (internal citations omitted). The claim fails for lack of cause unless the petitioner can establish that both question (1) and question (2) should be answered in the affirmative—in which case (but only in which case) the next question is whether the petitioner can establish prejudice. *Id.* For purposes of question (2) above, a "substantial claim" is a claim that has some merit or some factual support. *Landrum v. Anderson*, 813 F.3d 330, 335 (6th Cir. 2016). Manifestly, the first two claims are related in that to the extent that a particular claim of IATC is not "substantial" (i.e., lacks strength), post-conviction counsel is less likely to have been ineffective in not pressing the claim. *See Smith v. Carpenter*, No. 3:99-cv-0731, 2018 WL 317429, at *2 (M.D. Tenn. Jan. 8, 2018) (noting that the first prong of *Atkins* "is necessarily connected to the strength of the claim [post-conviction counsel] failed to raise").

Significantly, in *Shinn v. Ramirez*, 596 U.S. 366 (2022), the Supreme Court held that in determining whether there is cause under *Martinez*, a federal habeas court generally may not consider evidence outside the state court record. *Id.* at 371. That is, in considering whether there is ineffective assistance of postconviction counsel that suffices under *Martinez* to establish cause to excuse a procedural default of a claim of ineffective assistance of (trial) counsel, a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record "unless [the petitioner] satisfies one of two narrow exceptions," neither of which are applicable in the present case. *Id.* (citing 28 U.S.C. § 2254(e)(2)(A)).

It bears mentioning just how wrong a state court's decision must be to leave the door open for federal habeas relief. "[I]n order to obtain federal habeas relief, a state prisoner must show far more than clear error." *Klein v. Martin*, 607 U.S. 213, 220 (2026) (internal quotation marks and citation omitted).

One final point regarding the AEDPA bears mentioning. "AEDPA requires the *petitioner* to prove that the [state court's] error is 'an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States.'" *Davenport v. MacLaren*, 975 F.3d 537, 546 (6th Cir. 2020) (emphasis added) (quoting § 2254(d)(1)). The Court discerns that in practical application, a petitioner meets this "burden" of "prov[ing]" the unreasonableness of the state court's application of clearly established federal law whenever the court is able to clearly perceive such unreasonableness, based either on the petitioner's argument or otherwise.

<u>THE R&R's RECOMMENDATIONS</u>

As indicated in part above, the Magistrate Judge was tasked with addressing the following five claims:

 (1) Petitioner was denied effective assistance of counsel (allegedly, in the particular ways identified below);

(2) the State's (alleged) withholding of material evidence constituted a violation of *Brady v. Maryland*;

(3) the State knowingly proffered false testimony;

(4) Petitioner's confession was involuntary and should have been suppressed; and

(5) Petitioner's sentence of life imprisonment constituted cruel and unusual punishment in violation of the Eight Amendment because it was imposed for an offense pursuant to a "sentencing scheme that [according to Petitioner] mandates a sentence of life without the possibility of parole

upon conviction" of the offense, and such a scheme is—under *Miller v. Alabama*, 132 S. Ct. 2455 (2012)—violative of the Eighth Amendment when (and as) "applied to defendants who were juveniles at the time the offense was committed." (Doc. No. 51 at ¶ 57).

In the R&R, the Magistrate Judge recommends that the Court deny in full Petitioner's request for habeas corpus relief with respect to each and every claim.

As for the first claim, the Magistrate Judge found that only two of the subclaims—that trial counsel was ineffective in (1) failing to meet with him a sufficient number of times and (2) failing to file any written motions before trial—had been properly raised in state court and not been procedurally defaulted. (R&R at 14). The Magistrate Judge found that "any other allegations of ineffective assistance are procedurally defaulted and cannot be considered on the merits. . . [a]bsent a showing of cause excusing the default[.]" (R&R at 14).

As for two of the claims that *were* procedurally defaulted—namely that trial counsel was ineffective (1) in failing to effectively challenge the voluntariness of either Petitioner's *Miranda* waiver or his subsequent custodial statement and (2) when litigating the oral motion to suppress in that counsel failed to make a record of factors that would have refuted the voluntariness of Petitioner's waivers—the Magistrate Judge found that Petitioner had failed to show the requisite cause to excuse the procedural default under *Martinez*; he found that Petitioner had established neither that the first question under *Atkins* nor that the second question under *Atkins* should be answered in the affirmative. (*Id.* at 17-20). As for a third claim that was procedurally defaulted— that trial counsel was ineffective in failing to contest the Petitioner's transfer from juvenile court to adult court—the Magistrate Judge determined that *Martinez* was inapplicable because "the Sixth Circuit has held that the *Martinez* exception does not apply to claims of ineffective counsel during juvenile transfer proceedings." (*Id.* at 20-21) (citing *Atkins*, 792 F.3d at 663). As for a fourth claim

that was procedurally defaulted—that trial counsel was ineffective in failing to hire an expert witness—the Magistrate Judge found that "[u]nlike [with] Petitioner's other ineffective assistance claims, he does not raise the *Martinez* exception" in connection with this claim and thus had no excuse for the procedural default, and that in any event "Petitioner has failed to demonstrate that trial counsel performed deficiently" in this regard. (*Id.* at 21). And as for seven more specific claims that were procedurally defaulted, the Magistrate Judge found that "Petitioner has not provided an argument [under *Martinez* or otherwise] to establish cause for the default or to demonstrate actual prejudice . . . for these specific allegations by asserting that post conviction counsel was ineffective for failing to raise them" and that in any event, "Petitioner has not provided supporting facts in his supplemental brief or second amended petition to substantiate the merits of these claims." (*Id.* at 23).

As for the two claims of ineffective assistance of counsel that had not been procedurally defaulted, the Magistrate Judge analyzed them on the merits. As for the first—that trial counsel was ineffective in failing to spend sufficient time preparing Petitioner to testify at trial—the Magistrate Judge first noted that the Tennessee Court of Criminal Appeals rejected the claim (on the merits) on the grounds that Petitioner had failed to show how additional meetings with counsel would have changed the trial's outcome, then found that this determination by the Tennessee Court of Criminal Appeals was neither an unreasonable application of federal law nor based on an unreasonable factual finding. (*Id.* at 23-24). As for the second—that trial counsel was ineffective for failing to file any written motions—he found (albeit without actually discussing the state court's resolution of this issue) that the state court did not unreasonably apply clearly established law, because (in his view) trial counsel's decision not to file written motions was a strategic one inasmuch as (as far as Petitioner had shown) the potential motions cited in his habeas petition

would not have had any merit and trial counsel's testimony established that he "assessed the circumstances and determined that the benefits of the agreement with the State [not to file any written motions] outweighed the consequences." (*Id.* at 25-26).

As for Petitioner's second claim—that the State withheld material evidence in violation of *Brady*—the Magistrate Judge found that the claim was procedurally defaulted because it was not raised in state court. (*Id.* at 26). The Magistrate Judge further found that Plaintiff had not established the recognized grounds for cause for excusing a defaulted *Brady* claim, *i.e.,* that the reason the petitioner did not develop claim-supporting facts in state-court proceedings was the State's suppression of the relevant evidence. (*Id.* at 27).

As for Petitioner's third claim—that the State knowingly proffered false testimony (of Jennifer Blackwell)—the Magistrate Judge found that the claim was procedurally defaulted because it was not raised in state court. (*Id.* at 28-29). The Magistrate Judge further found that Petitioner "has not provided any argument to excuse this default for cause and has thus failed to overcome procedural default [and, likewise] does not claim actual prejudice, nor could he." (*Id.* at 29).

The Magistrate Judge found that the fourth claim—that Petitioner's confession was involuntary and should have been suppressed—was properly exhausted and then the Magistrate Judge proceeded to the merits of the claim, applying AEDPA deference to that claim. The Magistrate Judge found that Petitioner was unentitled to relief on that claim because (in his view) the Tennessee Court of Criminal Appeals ("TTCA") did not unreasonably apply the law or make an unreasonable factual determination in affirming the trial court's decision not to suppress Petitioner's statement. (*Id.* at 29-30).

The Magistrate Judge found that the fifth claim—that Petitioner's sentence of life imprisonment constituted cruel and unusual punishment—was properly exhausted and then the Magistrate Judge proceeded to the merits of the claim. (*Id.* at 30-31). In addressing the merits, the Magistrate Judge did not expressly apply AEDPA deference, perhaps because he believed that no deference to the TCCA's ruling was necessary to uphold the TCCA's ruling that *Miller* was simply inapplicable to Petitioner's sentence—life imprisonment with the possibility of parole (although not until service of 51 years of imprisonment, according to Petitioner). Addressing the fifth claim on the merits as if entirely *de novo*, the Magistrate Judge found—as had the TCCA—that *Miller* is inapplicable to Petitioner's sentence. (*Id.* at 31-32). The Magistrate Judge first effectively acknowledged that *Miller* is inapplicable to sentences of life *with* the possibility of parole, then reasoned that *Starks v. Easterling*, 659 F. App'x 277, 280-81 (6th Cir. 2016) teaches that a Tennessee state court does not make a decision that is contrary to, or involves an unreasonable application of, clearly established law when it holds that *Miller* is inapplicable to a sentence of life with the possibility of parole even assuming that the petitioner's life sentence *functionally equates* to life without parole—i.e., if the petitioner will not become parole eligible until after the petitioner is actuarially (statistically) likely to have died, i.e., exceeds his life expectancy.[7] (R&R at 31-32).

OBJECTIONS

In his Objections, Petitioner objects to three portions (and only three portions)[8] of the R&R. First, he objects to the Magistrate Judge's recommendation that Petitioner's "suppression-related

---

[7] Here, Petitioner alleged that that his life expectancy is 70.6 years and that he will be ineligible for parole until age 74. (Doc. No. 51 at ¶¶ 54-55). Relying on those allegations, Petitioner asserts that he "does not become eligible for release on parole until he exceeds his life expectancy [and thus] is serving a *de facto* sentence of life without the possibility of parole." (*Id.* at ¶ 56).

[8] It appears that Petitioner's approach was to identify his three strongest objections and forgo weaker objections. Petitioner is to be commended for this approach, as it focuses the Court's attention on the

claims for relief be denied," arguing that "[t]rial counsel was ineffective in failing to investigate suppression issues critical to [Petitioner]'s defense and in failing to file a necessary pre-trial motion to suppress [Petitioner]'s involuntary custodial statement." (Doc. No. 155 at 2). Second, he objects to the Magistrate Judge's recommendation that Petitioner's "trial testimony preparation claims for relief be denied," arguing that "[t]rial counsel was ineffective in failing to sufficiently and adequately prepare [Petitioner], then 17, before he testified and was subject to cross examination at trial." (*Id.* at 5).

Petitioner's third objection is, unfortunately, rather difficult to decipher. In its entirety (including its Roman-numerated header and the underlying text), the objection and the discussion in support of it reads as follows:

> **C.** **The Report and Recommendation's conclusion regarding the testimony preparation claims (II(A)) is erroneous.**[4]
>
> Mr. Swader acknowledges that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) does not excuse his default under *Atkins v. Holloway*, 792 F.3d 654 (6th Cir. 2015). He maintains that *Atkins* was wrongly decided and also maintains this claim for future appellate review, either by the en banc Sixth Circuit or the Supreme Court. For these reasons, he maintains that the Magistrate erred in denying this claim.

(Doc. No. 155 at 7) (footnote in original). As for the footnote (numbered 4), it reads in its entirety as follows: "This claim was presented in Claim 1 (paragraphs 28, 29, and 30) of [Petitioner]'s Second Amended Petition [what the Court herein has called simply the 'Amended Petition']. (D.E. 51.)" (Doc. No. 155 at 7 n.4). The Court simply cannot tell what claims Petitioner actually is referring to here. As an initial matter, the Court does not comprehend the reference to "II(A)." The R&R has no part "II(A)," and what it does have—a part "II"—is merely a statement of procedural history and does not even mention *Martinez* or *Atkins*. (R&R at 8-10). Likewise, the Amended

---

objections most likely to succeed without diverting the Court's attention to objections that are especially unlikely to succeed.

Petition has no part "II(A)," and what it does have—a part "II"—is merely a statement of jurisdiction and venue and does not even mention *Martinez* or *Atkins* or for that matter any *claims*. (Doc. No. 51 at ¶¶ 7-8).

Moreover, the claims are identified in the heading as "testimony preparation claims." One might think that this is a reference to the same claims implicated by the second objection, which likewise are identified in the second objection as "testimony preparation claims," (Doc. No. 155 at 5), and in particular claims that "[t]rial counsel was ineffective in failing to sufficiently and adequately prepare [Petitioner], then 17, before he testified . . . ." (*Id.*). But the second objection refers to these claims in terms not of "II(A)" but rather II(C)"—a reference that the Court finds just as mysterious as the inscrutable reference to II(A) but one that in any event is not the same as the reference to "II(A)." Furthermore, the footnote (numbered 4) alludes to paragraphs of the Amended Petition that relate *not* to "testimony preparation claims" (however that descriptor of claims may be construed) but to "[t]rial counsel fail[ing] to file any written motions," (Doc. No. 51 at ¶ 28), "[t]rial counsel fail[ing] to investigate the facts and circumstances of the crime and mitigating evidence in preparation for the transfer hearing, the trial, and the sentencing hearing," (*id.* at ¶ 29), and "[t]rial counsel fail[ing] to contest the transfer of [Petitioner]'s case from juvenile to adult court," (*id.* at ¶ 30).

Finally, in stark contrast to the header for this objection, the text underlying the header says nothing at all about trial preparation claims, or indeed any substantive claims, in particular. Instead, it refers only to the rules (as articulated in *Martinez* and *Atkins*) for excusing the default of certain kinds of claims.

Given this confusion,[9] the Court is relegated to making of this objection whatever it can. So doing, the Court will construe it in a manner that it is confident will serve Petitioner's purpose of stating the objection. That is, the Court will treat this objection as an overarching objection to each instance of the Magistrate Judge's invocation of the Sixth Circuit's opinion in *Atkins* in deciding that Petitioner had not established cause (in the form of ineffective assistance of post-conviction counsel) for the procedural default of claims of ineffective assistance of trial counsel.

<u>DISCUSSION</u>

The Court above has described not just the Magistrate Judge's findings as to which objection has been made, but also the rationale for those findings. Describing such rationale is helpful for placing into context the issues raised for the Court via Petitioner's Objections. It is also helpful for indicating potential resolutions of those issues; that is, to the extent that the Court ends up agreeing with the Magistrate Judge's rationale, his rationale has indicated the Court's view of how the issues raised by the objections should be resolved. But the Court notes that under 28 U.S.C. § 636(b), its task is not actually to critique, or to approve or disapprove, the rationale of the Magistrate Judge; and its task certainly is not to decide whether the Magistrate Judge's rationale was reasonable. Rather, its task is to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). And so that is what the Court will do below: provide a *de novo* review of the three issues as to which the Magistrate Judge made a recommendation to which Petitioner objected, without deferring to the Magistrate Judge's decision in any way.

---

[9] In contrast to this confusion, Petitioner speaks with admirable clarity (and candor) in expressing her view about the Magistrate Judge's application of *Atkins*: that such application was appropriate as the law now stands (with *Atkins* currently being good, and binding, law) but that *Atkins* was (according to Petitioner) wrongly decided and is subject to being overturned in the future, to Petitioner's benefit.

The Court has reviewed the objections, the Magistrate Judge's findings, and other relevant parts of the record, to assess *de novo* the parts of the R&R implicated by the Objections. On *de novo* review, the Court adopts those portions of the R&R to which objections have been made.[10] The Court will address each objection in turn.

A.  <u>The Court adopts the Magistrate Judge's recommended denial of Petitioner's claim that trial counsel was ineffective in failing to investigate suppression issues and in failing to file a necessary pre-trial motion to suppress Petitioner's (alleged) involuntary custodial statement.</u>

Via his first objection, Petitioner challenges the Magistrate Judge's denial of relief on Petitioner's "suppression-related claims." As an initial matter, it is necessary to identify what claims Petitioner is referring to here. In one place, Petitioner suggests that the reference is to claims that that "[t]rial counsel was ineffective in failing to investigate suppression issues critical to [Petitioner]'s defense and in failing to file a necessary pre-trial motion to suppress [Petitioner]'s involuntary custodial statement." (Doc. No. 155 at 2). But the Court believes that Respondent has set forth the appropriate identification of the specific claims within the scope of this objection:

> Petitioner's heading for this objection contains a footnote outlining the various "suppression-related claims": The suppression-related claims "were presented in Claim 1 (paragraphs 26 and 28) and Claim 4 of [Petitioner]'s Second Amended Petition, (D.E. 51), and in Part B of his Supplemental Brief, (D.E. 141.)." (*Id.*) Those portions of Petitioner's Second Amended Petition allege: (1) counsel was ineffective by not effectively challenging the voluntariness of Petitioner's *Miranda* waiver and confession; (2) counsel was ineffective by not filing any written motions other than a motion for discovery; and (3) Petitioner's waiver and confession were involuntary.

(Doc. No. 159 at 3).

As to the third claim, as noted above, the Magistrate Judge first observed that the Tennessee Court of Criminal Appeals on direct appeal had affirmed the trial court's decision not to suppress

---

[10] It would be fair to characterize the Court's decision also as an overruling of Petitioner's objections, but as noted above, under the law, the operative decision of the Court is to adopt on *de novo* review the portions of the R&R to which objection has been made.

Petitioner's statement, which disposed of the claim on the merits. (R&R at 29). Then the Magistrate Judge found that Petitioner had not shown—as required by the AEDPA—that in so doing, the TCCA had unreasonably applied the law or made an unreasonable factual determination. (*Id.* at 29-30). In his Objections, Petitioner does not even argue that he has met the standard required by the AEDPA with respect to this claim. At most, he argues only that the Magistrate Judge's *own* analysis of the voluntariness of Petitioner's confession was flawed; he does not argue that *the TCCA's* analysis was wrong—let alone that it was so egregiously wrong as to trigger the standard for relief under the AEDPA. *Klein*, 607 U.S. at 220 (noting that in order to obtain federal habeas relief, a state prisoner must show far more than clear error). And the Court has reviewed on its own the TCCA's multi-page discussion of this issue (which is in its opinion on direct appeal, not post-conviction review), found at *State v. Swader*, No. M2005-00185-CCA-R3-CD, 2006 WL 287384, at *7-9 (Tenn. Crim. App. Feb. 6, 2006).[11] The Court does not see anything in the application of the law or the determination of the facts that comes anything close to being so unreasonable as to go far beyond clear error. So, on *de novo* review of the third claim, the Court adopts the Magistrate Judge's reasoning, finding it to be sound.

All of this can be said likewise for the claim that trial counsel was ineffective for not filing any written motions (including a written motion to suppress) (i.e., the second claim). The Magistrate Judge noted throughout the R&R that the Tennessee Court of Criminal Appeals, on appeal from the trial court's denial of post-conviction relief, had addressed this claim on the merits. (R&R at 7; 25-26). In fact, as the R&R implied, the TCCA denied this claim on the merits. *Swader v. State*, No. M2008-01021-CCA-R3-PC, 2009 WL 3199537, at *3 (Tenn. Crim. App. Oct. 7,

---

[11] The Court here gives the full citation (with a pinpoint citation) to this opinion as found on Westlaw; the Magistrate Judge had cited to the opinion as found on LEXIS.

2009).[12] The Magistrate Judge found that Petitioner had not shown—as required by the AEDPA—that in so doing, the TCCA had unreasonably applied the law. (R&R at 25-26). In his Objections, Petitioner does not even argue that he has met the standard required by the AEDPA with respect to this claim. And the Court has reviewed the TCCA's discussion of this issue (which is in its opinion on appeal of post-conviction review), which was as follows:

> [Petitioner's] second claim is that counsel was ineffective for failing to file any written motions prior to trial. During the post-conviction hearing, trial counsel testified that he did not file written motions as part of his strategy of negotiation. Trial counsel testified that he reached an agreement that secured the State's withdrawal of its notice of enhancement factors in exchange for not filing for a continuance prior to trial. During the post-conviction hearing, the defendant testified that he did not know which motions should have been filed but believed that written motions would have benefitted him at trial. The petitioner has not demonstrated that the outcome of trial would have been different if written motions to suppress, to have the petitioner evaluated, to change venue, or to receive funds for experts had been filed. Therefore, he is not entitled to relief on this issue.

*Swader*, 2009 WL 3199537, at *3. This explanation, though brief, appears perfectly reasonable. The Court is fully aware that "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). But it makes the obtaining of relief a task far more daunting than it otherwise would be; after all, presumably it is rare indeed that a court gets a decision so wrong that it reflects "far more than clear error," *Klein*, 607 U.S. at 220 (internal citation and quotations omitted), or is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The Court does not see here anything in the application of the law (or for that matter the determination of the facts) that comes anything close to being so unreasonable as to go far beyond clear error.

---

[12] Again, the Court here gives the full citation (with a pinpoint citation) to this opinion as found on Westlaw; the Magistrate Judge had cited to the opinion as found on LEXIS.

And Petitioner makes no argument whatsoever specific to trial counsel's failure to file written motions.

To the extent that Petitioner's claim here concerns the failure to file a written motion *to suppress his statement* in particular, Petitioner fares no better. As indicated above, the Magistrate Judge treated this claim (at least to the extent that it was a claim separate from the claim concerning a failure to file any written motions *generally*) as procedurally defaulted. (R&R at 17-18). He then found that Petitioner had failed to show that the procedural default was excused under *Martinez*, inasmuch as the claim was not "substantial" as required by *Atkins* for excusal under *Martinez*; in so finding, the Magistrate Judge relied on information in the state-court record showing that "'defense counsel [made] an oral motion for the trial court to suppress the appellant's statement,' which the trial court then considered on the merits [and that] [c]ounsel's decision to proceed orally was made to avoid delaying trial and, as a result, reflects a strategic judgment rather than a deficiency in performance." (*Id.* at 18). The Magistrate Judge also found, relatedly, that the failure to file a written suppression motion did not prejudice Petitioner (which would be required by *Atkins* for this alleged failure to constitute cause to excuse a procedural default under *Martinez*), because trial counsel did "rais[e] the suppression issue in a manner [i.e., orally] that allowed the court to consider it on the merits[.]" (*Id.*).

On *de novo* review, the Court adopts the Magistrate Judge's reasoning, finding it to be sound. And, as the Court observed above, Petitioner makes no argument whatsoever that is specific to trial counsel's failure to file written motions, and this observation applies to a written motion *to suppress* in particular.

That leaves only the claim that counsel was ineffective by not *effectively* challenging the voluntariness of Petitioner's *Miranda* waiver and confession (i.e., first claim). The claim here

appears to be that trial counsel was ineffective in *how* he went about litigating the oral motion to suppress Petitioner's statement; in the Objections, Petitioner complains that "[t]rial counsel did not present any evidence or cite to any case in support of this oral motion, made the morning of trial, and did not even provide the video evidence to the judge," thus leaving "[t]he unredacted video of the interrogation [out] of the record." (Doc. No. 155 at 3-4). The Magistrate Judge elaborated on Petitioner's view as to how trial counsel was ineffective in this regard:

> Petitioner contends that counsel's failure to present key factors deprived the court of evidence demonstrating that he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights. Docket No. 141, p. 24. Specifically, Petitioner asserts that trial counsel should have highlighted the following: (1) Petitioner was 16 years old at the time of the interrogation; (2) he was enrolled in special education classes, had various learning disabilities, and trial counsel failed to investigate evidence of potential intellectual impairments; (3) no evidence was introduced regarding any prior interactions with the criminal justice system that would have given him the knowledge to request an attorney; and (4) he repeatedly asked to see his mother. Docket No. 141, p. 24-27.

(R&R at 18).

Petitioner does not appear to dispute that this claim was procedurally defaulted and that it can be considered only if *Martinez* is satisfied. And *Martinez* is not satisfied unless the claim is "substantial." The Magistrate Judge found that this claim was not substantial, because "the considerations raised by the Petitioner would not have altered the outcome of the motion to suppress [Petitioner's statement]." (R&R at 19). In so concluding, the Magistrate Judge reasoned as follows:

> Although the Petitioner was sixteen years old at the time of the statement, the other considerations raised by the Petitioner do not equate to a finding that he was incompetent or unable to voluntarily waive his *Miranda* rights. First, the fact that the Petitioner was enrolled in special education classes and suffered from dyslexia and panic attacks are non-dispositive. As stated by the Sixth Circuit, "our sister circuits have found several instances where defendants, despite their mental retardation or low I.Q. were found to have waived their rights knowingly and intelligently." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005). The Tennessee Court of Criminal Appeals determined that the Petitioner had the capacity to

understand the consequences of the waiver. He was not under the influence of drugs or alcohol, he conceded that he received his Miranda warnings, he read aloud the first line of his statement, he signed the waiver form, and he had previously been adjudicated delinquent for multiple offenses. *Swader*, 2006 Tenn. Crim. App. LEXIS 109, at *25-27. While his mother was not present, the absence of Petitioner's mother is non-dispositive because his history of drug use, disorderly conduct, curfew violations, driving without a license, and assault demonstrate an independence of mind and behavior, undermining any claim that his request to see his mother was akin to a request for counsel. *Ashurst v. Morris*, No. 89-3502, 1990 U.S. App. LEXIS 16054, at *10 (6th Cir. Sep. 11, 1990) (holding that a juvenile's request to call his mother did not invoke the right to counsel where his actions showed independence of mind and behavior, including drug use, late-night carousing, and holding a job). Conversely, the record demonstrates "the [Petitioner] possessed normal intelligence" and "had the capacity to understand the consequences of waiving his Miranda rights. *Id.* at *27. Therefore, even if the Petitioner's trial counsel's performance was deficient, the Petitioner cannot satisfy *Strickland*'s prejudice inquiry, as the arguments would not have altered the outcome. *Carter*, 910 F.3d at 841 (holding that an ineffective assistance claim is meritless when alternative arguments proffered by the defendant would not have changed the outcome).

Consequently, Petitioner's claim is without merit and fails to satisfy the first two prongs of the *Atkins* framework, preventing him from establishing cause to excuse his procedural default.

(*Id.* at 19-20). Finding this reasoning persuasive, the Court adopts it on *de novo* review. Resisting

this conclusion, Petitioner asserts:

The Magistrate further erred in considering the factors about whether a juvenile confession is voluntary on an individual basis, rather than cumulatively as required [by *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)] under a "totality of the circumstances" review. When considered together, the factors outlined in *A.M. v. Butler*, 360 F.3d 787, 799 800 (7th Cir. 2004), reveal that this issue would have been meritorious had it been properly investigated and litigated. . . . [Petitioner's] age, his mental deficits, and the fact that his mother was not permitted to be present despite his requests, together made his statement involuntary.

(Doc. No. 155 at 4) (citations omitted).

The Court does not agree that the Magistrate Judge eschewed a "totality of the circumstances" approach or that Petitioner's statement was involuntary (or, more to the point for the inquiry under *Atkins*, that Petitioner's claim that his statement was an involuntary statement

was "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*). As Respondent suggests, (Doc. No. 159 at 5-6), the Magistrate Judge expressly acknowledged that a court must examine the "totality of the circumstances," (R&R at 18-19), then went on to describe a variety of circumstances that strongly supported a finding that the statement was made voluntarily. (*Id.* at 19-20). And the Court puts little stock in the fact that Petitioner was enrolled in special education classes and suffered from dyslexia and panic attacks. Dyslexia and enrollment in some sort of special education classes are not by themselves necessarily indicative whatsoever of an intelligence deficit, and the Court does not see where the record reflects that he experienced a panic attack at the time of giving his statement; even if the situation naturally would be quite stressful, that does not mean that it fostered in Petitioner a panic attack that somehow took away his intelligence, understanding, or free will.

For all of the reasons stated above, the Court adopts the R&R with respect to those portions of it that are implicated by the first objection.

B. <u>The Court adopts the Magistrate Judge's recommended denial of Petitioner's "trial testimony preparation" claims.</u>

Petitioner's next objection is to the Magistrate Judge's recommended rejection of the claim that trial counsel was ineffective in failing to spend sufficient time preparing him to testify at trial. As noted above, the Magistrate Judge first noted that the Tennessee Court of Criminal Appeals rejected the claim on the merits, on grounds that Petitioner had failed to show how additional meetings with counsel would have changed the trial's outcome; the Magistrate Judge, applying AEDPA deference, then found that this determination by the Tennessee Court of Criminal Appeals was neither an unreasonable application of federal law nor based on an unreasonable factual finding. (R&R at 23-25).

As an initial matter, the Court notes that AEDPA deference indeed applies here, just as the Magistrate Judge indicated. But Petitioner does not appear to acknowledge, let alone deal with, that reality. As Respondent notes:

> Petitioner objects to the magistrate judge's conclusion that the TCCA's *Strickland* application was reasonable as to his IATC claim alleging a failure to prepare Petitioner to testify at trial. (ECF No. 155, PageID 2047-49.) While the [M]agistrate [J]udge analyzed this claim through the lens of AEDPA, Petitioner's objections appear to be framed under the assumption that the claim was procedurally defaulted and excused under *Martinez*. (ECF No. 155, PageID 2049 ("This is a substantial, constitutional claim that would have affected the outcome of trial, and the Report and Recommendation erred in concluding that it be denied.")). But as Respondent previously argued in his supplemental brief, (ECF No. 142, PageID 1985), and as correctly determined by the [M]agistrate [J]udge, this claim is subject to AEDPA deference because the TCCA rejected it on the merits, (ECF No. 147, PageID 2020). See *Swader v. State*, 2009 WL 3199537, at *3.

(Doc. No. 159 at 7).

Petitioner fails to surmount the challenge posed by the AEDPA. Indeed, as indicated above, Petitioner does not even try to do so. Instead of trying to show that the TCCA's decision on this claim was egregiously wrong as contemplated by *Klein* and *Harrington*, he attempts merely to assert that the claim was "substantial" (or, at most, to assert that the claim was ultimately meritorious). And the Court does not perceive on its own, under *de novo* review, that the TCCA's decision was of the kind that can trigger relief under the AEDPA. In its appeal affirming the trial court's denial of post-conviction relief, the TCCA resolved this claim as follows:

> Here, the petitioner argues that trial counsel was not sufficiently prepared for trial. First, he argues that trial counsel failed to meet with the petitioner a sufficient number of times. The petitioner claims that trial counsel did not spend an adequate amount of time with him prior to trial; however, he fails to demonstrate that more frequent meetings would have produced a different outcome at trial. The petitioner acknowledged that he was responsible for shooting the victim but claims that it was an accident. The jury verdict reflects that they were persuaded to believe that the killing was not premeditated when the charge of first degree murder was rejected. Ultimately, the petitioner was convicted of first degree (felony) murder

and second degree murder. The petitioner has failed to demonstrate that trial counsel was ineffective for failing to meet with him more often.

*Swader*, 2009 WL 3199537, at *3. The explanation here, though again brief, appears perfectly reasonable. And it certainly does not reflect "far more than clear error."

For all of the reasons stated above, the Court adopts the R&R with respect to those portions of it that are implicated by the second objection.

C. <u>As Petitioner concedes, the objection to the Magistrate Judge's application of *Atkins* is without merit under present law, but Petitioner has preserved the objection to the application of *Atkins* in case *Atkins* is overruled.</u>

As suggested above, it is clear (and Petitioner does not dispute) that the Magistrate Judge's application of the Sixth Circuit's reported decision in *Atkins*, which to this day remains binding precedent for district courts within the Sixth Circuit, was appropriate. It appears that Petitioner has made this objection just in case, consistent with Petitioner's view that *Atkins* was wrongly decided, *Atkins* is overruled either by the Sixth Circuit en banc or by the Supreme Court.

Accordingly, the Court on *de novo* review finds nothing incorrect in the Magistrate Judge's application of *Atkins*, but (as far as the Court is concerned) Petitioner has done all that he can to preserve, for potential future use, an objection to the application of *Atkins* based on the assertion that *Atkins* was wrongly decided.

## **CONCLUSION**

After the required *de novo* review of the portions of the R&R (Doc. No. 147) to which an objection has been made, the Court adopts the R&R both as to those portions and as to all other portions. As a result, the Amended Petition (Doc. No. 51) is **DENIED** in full.

The "Motion to Substitute" (Doc. No. 160) is **GRANTED**, and the Clerk is directed to substitute Shawn Phillips, Warden in place of Guy Bosch, Warden as the Respondent.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

In the view of the undersigned, Petitioner has not made a substantial showing of the denial of a constitutional right, in that reasonable jurists could not debate whether (or, for that matter, agree that) the Amended Petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Thus, the Court declines to issue a COA, but Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals, which conceivably could have a different view. Rule 11(a), Rules Gov'g § 2254 Cases.

The Clerk is **DIRECTED** to enter judgment under Rule 58 and close the file.

IT IS SO ORDERED.

ELI RICHARDSON
UNITED STATE DISTRICT JUDGE